**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 96-40592
(Summary Calender)

_____

YQUADEA DOVE AND
THERESA ROGERS,

Plaintiffs-Appellants,

versus

WESTWARD TRAILS MANOR, INC.
D/B/A WESTWARD TRAILS MANOR

Defendant-Appellee.

_____

Appeal From the United States District Court
for the Eastern District of Texas
(No. 95-111)

_____

February 19, 1997

Before HIGGINBOTHAM, WIENER, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

This is an appeal from the district court's grant of summary

judgment in favor of Defendant-Appellee Westward Trails Manor,

Inc., d/b/a Westward Trails Manor ("Westward"), dismissing

---

[*] Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

Plaintiffs-Appellants Yquadea Dove's and Teresa Rogers' claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964[1] and race discrimination under both Title VII and 42 U.S.C. § 1981. For the reasons that follow, the district court's grant of summary judgment is affirmed.

**I**

**FACTS AND PROCEEDINGS**

Westward operates a nursing home in Nacogdoches County, Texas. Former plaintiff Camellia Ann Kelly worked as a housekeeper for Westward. Plaintiffs Dove and Rogers worked as Certified Nurse's Aids for Westward. In March 1994, Westward also hired Vincent Wilburn to work as a Certified Nurse's Aid. He was not a supervisor of any of the plaintiffs.

On June 18, 1994, Wilburn approached Kelley from behind while she was cleaning one of the bathrooms in the nursing home, exposed his genitals to her, and made lewd remarks. Kelly pushed Wilburn out of the way and left the bathroom.

The next day on which Kelly was scheduled to work while management was present was June 22, 1994. On that date —— her first opportunity —— she reported the Wilburn incident to her immediate supervisor, Elizabeth Duke, who advised Kelly to report the incident to Wilburn's supervisor, Carol Molandes. Neither supervisor documented Kelly's report, but Molandes told Kelly that

---

[1] 42 U.S.C. § 2000e et seq.

she would "take care of it."

The next day (June 23rd), after admitting his role in the bathroom incident, Wilburn was given a written "first warning."[2] That same day, however, Wilburn strolled down a hallway in the presence of Kelly, holding a banana at his crotch, waving it like a phallus, and laughing. Kelly promptly reported this incident to Westward Administrator Joyce Lewis. At the meeting with Lewis, Westward's Director of Nursing, Vickie Randall, called Kelly a "trouble maker" and told Kelly she would either have to work with Wilburn or leave. Instead of taking any additional disciplinary action against Wilburn, Lewis told Kelly that the most they could do was transfer her to another assignment. Believing that Wilburn would be allowed to continue harassing her and that her complaint was not being taken seriously, Kelly resigned that day.

The next day, in the wake of Kelly's resignation, Westward supervisor Molandes asked plaintiffs Dove and Rogers whether Wilburn had ever harassed them in a sexual manner. Both plaintiffs separately reported that, indeed, Wilburn had made sexually suggestive remarks to them. They also reported that he had performed lewd "humping" gestures with elderly female patients who he was responsible for lifting in the showers. Both plaintiffs

---

[2] Plaintiffs claim there is a factual dispute as to whether this first warning was in fact given. Wilburn testified in deposition that Westward management talked with him about Kelly's complaint, but the actual warning notice that Westward introduced as evidence of the warning does not indicate receipt or acknowledgment by Wilburn.

acknowledge never having complained about Wilburn's behavior prior to the questioning initiated by Molandes on June 24, 1994.

Having ferreted out these additional reports of inappropriate behavior from Dove and Rogers, Westward administrators Randall and Molandes met with Wilburn and informed him of Dove's and Rogers' complaints. These administrators apparently did not immediately take any further remedial action.[3]

Later that same day (June 24th), Wilburn waited for Rogers and Dove to leave work (Dove was giving Rogers a ride home), chased Dove's vehicle with his, and reportedly tried to run Dove's vehicle off the road. Dove promptly reported this incident to Westward Administrator Lewis who responded that, as it had occurred outside of work, there was nothing she could do about it.

Four days later, on June 28, 1994, Wilburn told other Westward employees that he wanted to burn down Dove's and Rogers' houses and shoot both women and their children as they came running out of their homes. Rogers reported these threats to Molandes at 11:45 that morning. After questioning (1) Wilburn, who denied making the threats, and (2) two other employees, both of whom confirmed that

---

[3] There appears to be a factual dispute as to whether Wilburn was issued a second warning at this meeting or was merely informed of the additional complaints. It is also possible that this meeting was actually the meeting in which Wilburn received his first warning. The factual record is, to say the least, somewhat confusing regarding the precise chronology of warnings and meetings between Wilburn and Westward management. This apparent dispute, however, does not rise to the level of materiality even if it is genuine.

4

Wilburn had made the threats, Molandes called Wilburn into his office and effectively fired him at 12:15 that afternoon — thirty minutes after first hearing of the threats. Molandes immediately informed Dove and Rogers that Wilburn had been fired or "was gone."

Nevertheless, two days later — June 30, 1994 — both Dove and Rogers quit their jobs at Westward. In explaining their resignations, both plaintiffs assert that Molandes refused to talk with them and treated them coolly at a staff meeting the next day; they also state that other employees began calling them "trouble makers," the term first used by Ms. Randall in reference to Kelly. In addition, Dove contends that her work assignment was temporarily changed from working a hall to working only in the showers.

After filing timely discrimination charges with the Equal Employment Opportunity Commission and receiving their right-to-sue letters, plaintiffs Kelley, Dove, and Rogers filed the instant suit against Westward in April 1995, asserting Title VII claims for sexual harassment and retaliation, and claims for race discrimination pursuant to Title VII and 42 U.S.C. § 1981. In late January 1996, Kelly settled by accepting an offer of judgment from Westward in the amount of $14,000. Soon thereafter Westward filed a motion for summary judgment, asserting that (1) it was not liable for Dove's and Rogers' Title VII sexual harassment and race discrimination claims because Westward had taken prompt remedial action, and (2) their race discrimination claims were precluded by Westward's remedial action, and any such claims arising under

5

section 1981 were specifically precluded as a matter of law by Patterson v. McLean Credit Union.[4]

In May 1996, the district court not only granted Westward's motion for summary judgment on Dove's and Rogers' sexual harassment and race discrimination claims but also dismissed sua sponte plaintiffs' retaliation claims, albeit the court did so without providing any further analysis. Dove and Rogers timely filed their Notice of Appeal and now specifically challenge the district court's grant of Westward's summary judgment motion, dismissing their sexual harassment and race discrimination claims, as well as the court's sua sponte grant of summary judgment dismissing their retaliation claims.

**II**

**ANALYSIS**

**A. Standard of Review**

We review a grant of summary judgment de novo and apply the same standards as used in the district court.[5] Summary judgment is therefore appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[4] 491 U.S. 164, 178, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). As plaintiffs note and defendant acknowledges, however, the Civil Rights Act of 1991 amended section 1981 to overrule Patterson. See 42 U.S.C. § 1981(b); Partee v. Metro. School Dist. of Washington Tp., 954 F.2d 454, 457 (7th Cir. 1992).

[5] LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 447 (5th Cir. 1996).

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6]

A trial court may <u>sua sponte</u> grant a motion for summary judgment as to any claim as long as the court provides the losing party with ten days notice to come forward with all of his evidence on that claim.[7] When a district court grants a <u>sua sponte</u> summary judgment without having provided the proper notice, however, the summary judgment will only be affirmed if the lack of notice is found to constitute harmless error.[8] Summary judgment will be considered "harmless" in such a circumstance "<u>if the nonmovant has no additional evidence</u> or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact."[9] Put another way, the party seeking to avoid a <u>sua sponte</u> summary judgment "must present specific evidence that creates a genuine issue of material fact, or at least identify how additional discovery would yield

---

[6] Fed. R. Civ. P. 56(c).

[7] Fed. R. Civ. P. 56(c); <u>Celotex v. Catrett</u>, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

[8] <u>Nowlin v. Resolution Trust Corp.</u>, 33 F.3d 498, 504 (5th Cir. 1994); <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 28 F.3d 1388, 1398 (5th Cir. 1994).

[9] <u>Nowlin</u>, 33 F.3d at 504 (quoting <u>Leatherman</u>, 28 F.3d at 1398) (emphasis in original).

such an issue."[10]

In the instant case, plaintiffs Dove and Rogers have proffered the additional deposition evidence that they would have introduced had they received notice that the district court was considering summary judgment on their retaliation claims as well as their sexual harassment and race discrimination claims. Accordingly, on appeal we have considered this additional evidence in reviewing the district court's grant of summary judgement on plaintiffs' retaliation claim.

## B. <u>Sexual Harassment Claims</u>

To prevail on a claim of sexual harassment in the workplace, a plaintiff must demonstrate each of the following elements:

    (1)   the employee belongs to a protected group;

    (2)   the employee was subject to unwelcome sexual harassment;

    (3)   the harassment was based upon sex;

    (4)   the harassment was so pervasive as to alter the employee's conditions of employment and create an abusive working environment; and

    (5)   the employer knew or should have known of the harassment and failed to take prompt remedial action.[11]

In this case Westward argued, and the district court agreed, that

---

[10] <u>Id.</u>

[11] <u>Nash v. Electrospace System, Inc.</u>, 9 F.3d 401, 403 (5th Cir. 1993), citing <u>Jones v. Flagship International</u>, 793 F.2d 714, 719-20 (5th Cir. 1986), <u>cert. denied</u>, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); <u>see also</u> <u>Hirras v. Nat. R.R. Passenger Corp.</u>, 95 F.3d 396, 398 (5th Cir. 1996).

Westward was entitled to summary judgment on plaintiffs' sexual harassment claims because Westward took prompt remedial action when it learned of Wilburn's inappropriate behavior towards Dove and Rogers. As we have previously observed, the determination whether an employer's remedial response to discriminatory conduct is sufficiently prompt and appropriately calibrated will "depend on the particular facts of the case——the severity and persistence of the harassment and the effectiveness of any initial remedial steps."[12] In general, a remedial action sufficient to avoid liability is one that is "'reasonably calculated' to end the harassment."[13] Here, the district court focussed on two obvious facts in evaluating Westward's remedial actions: (1) Neither Dove nor Rogers reported any sexual harassment by Wilburn before June 24, 1994, when Westward took the initiative and inquired; and (2) Wilburn was fired on June 28, 1994, albeit for his intervening threats of violence. The court then held that Westward's termination of Wilburn's employment within four days of plaintiffs' first complaint established, as a matter of law, that Westward took adequate remedial action with sufficient dispatch to preclude plaintiffs' recovery.

Plaintiffs now argue that this conclusion is flawed for

---

[12] Hirras, 95 F.3d at 399-400 (quoting Waltman v. International Paper Co., 875 F.2d 468, 479 (5th Cir. 1989).

[13] Garcia v. Elf Atochem North America, 28 F.3d 446, 451 (5th Cir. 1994) (citng Jones, 793 F.2d at 719-20).

several reasons.  First, they note that Wilburn's sexual harassment was severe, persistent, and openly practiced.  Second, they observe that Wilburn's sexual harassment was first explicitly reported by Kelly on June 22nd.  Given these facts, they argue that Westward's first written warning to Wilburn on June 23rd (after Kelly's report) was too lenient and, further, that Westward's apparent failure to take any additional remedial action immediately following Dove's and Rogers' reports confirms the inadequacy of Westward's response.  Finally, they argue that Westward's remedial actions failed to encourage victims of harassment to come forward,[14] but instead, by confronting Wilburn with new complaints of sexual harassment and identifying the plaintiffs as the complainers, exposed plaintiffs to Wilburn's retaliatory actions and thereby accomplished the opposite result.

As Westward notes in response, it is indisputable that from the time Westward gave Wilburn his first warning and received plaintiffs' complaints until the time he was fired — a period of just four or five days — Wilburn never again subjected Dove or Rogers to any _sexual_ harassment.  To be sure, he appears to have directed tortious or even criminal conduct towards the plaintiffs "off campus"; but his harassing behavior of an explicitly _sexual_ nature never recurred.  Consequently, we conclude that Westward's

---

[14] _See_ _Meritor Savings Bank, fsb v. Vinson_, 477 U.S. 57, 73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (indicating in dicta that employer's anti-discrimination policies should be "calculated to encourage victims of harassment to come forward").

remedial actions –– issuing a written warning; commencement of an investigation; and the firing of Wilburn within minutes after confirming his threats to injure the plaintiffs –– were, in the circumstances of this case and seen in combination, not only "'reasonably calculated' to end the harassment,"[15] but were effective in ending it finally and promptly.[16]  Indeed, the entire episode –– from Wilburn's initial harassment of Kelly until he was fired –– lasted but ten days.  As a result, plaintiffs cannot establish a genuine issue of material fact as to the fifth and final Nash element of their sexual harassment claim, and therefore summary judgment on this claim was proper.

## C. Retaliation Claims

The district court granted summary judgment on plaintiffs' retaliation claim without providing us with the benefit of its analysis except for stating conclusionarily that "the summary judgment evidence is totally lacking."  Although we agree with that conclusion, we shall briefly explain our reasoning based upon all of the summary judgment evidence, including the additional evidence proffered through the plaintiffs' Motion to Modify the Record

---

[15] Garcia, 28 F.3d 451.

[16] See Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309 (5th Cir. 1987) (employer's assurance, offered less than twelve hours after initial complaint was made, that complaining employee would not have to work with harassing co-employee after current business trip ended constituted prompt remedial action sufficient to preclude plaintiff's recovery)

11

pursuant to Rule 10 of the Federal Rules of Appellate Procedure.[17]

To state an actionable claim for retaliation under Title VII, a plaintiff must establish that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action following the protected activity, and (3) a causal connection existed between the protected activity and the adverse action.[18] Dove and Rogers plausibly contend that by reporting Wilburn's offensive sexual conduct on June 24 they opposed an unlawful employment practice and thus satisfied the protected activity requirement of their retaliation claim.

To establish the second element of their retaliation claim, however, plaintiffs can only point to Wilburn's actions — his off-premises, after hours, attempted vehicular assault and his open threats, communicated to third parties, to kill plaintiffs and their families — as evidence of their having experienced an adverse employment action. Unfortunately for plaintiffs, Wilburn's admittedly reprehensible actions simply cannot be attributed to his

---

[17] The additional evidence, which was not included in plaintiffs' response to Westward's motion for summary judgment but which we have considered on appeal, consists of excerpts of two depositions. In one, Joyce Lewis acknowledged that the purported vehicular assault was reported to her but that she told the plaintiffs that she could take no action as the incident had occurred outside the scope of their and Wilburn's employment; and in the other, plaintiff Dove said that she had resigned not just because of Wilburn's retaliatory actions but also because her co-workers and supervisors sneered at her and would not speak to her, and because she was temporarily reassigned to work only in the showers.

[18] Nowlin, 33 F.3d at 507.

12

employer, Westward. To the contrary, Wilburn acted, albeit tortiously and perhaps even criminally, on his own initiative — a classic "lark" in no way attributable to the scope of his employment. Of course, the possibility that Wilburn — merely a co-worker — might have been motivated by a desire to retaliate against Dove and Rogers for their actions against him personally does not mean that Westward intended to or in fact did invite this behavior and thereby subject the plaintiffs to an adverse employment action. Instead, the evidence shows that Westward did not fire the plaintiffs, demote them, dock their pay, substantially change their work assignments, or take or refrain from taking any other action that could reasonably be characterized as an adverse employment action. Indeed, all it did was to initiate an appropriate and timely investigation in response to plaintiffs' allegations and timely confront Wilburn with the fact that two more co-employees had complained of inappropriate sexually-tinged behavior. In short, Wilburn took reprehensible personal actions against the plaintiffs; Westward took no adverse employment action against them.

As plaintiffs have not shown the existence of a genuine issue of material fact as to this second element of their retaliation claims, summary judgment is appropriate on these claims as well.

## D. <u>Race Discrimination Claims</u>

Finally, plaintiffs' allegations of racial discrimination,

13

whether founded on Title VII or § 1981, are almost entirely premised on the same allegations as are their sexual harassment and retaliation claims. In short, they argue that Westward tolerated Wilburn's sexual harassment of them because they are black. As we have found that there was no actionable sexual harassment given Westward's prompt remedial action in response to Wilburn's conduct, plaintiffs' claims of racial discrimination simply cannot stand. We add, however, that the minor fact that Westward's management, albeit comprised entirely of whites, fired Wilburn, a black, after two employees, the first black and the second white, confirmed his threats against the plaintiffs, would have been too slender a reed to support a race discrimination claim even if there had been actionable sexual harassment. As Westward noted, it sought confirmation from its employees in rapid succession after Rogers reported Wilburn's threats, and called in witnesses as soon as they were mentioned by plaintiffs or others. In other words, not even a glimmer of racial discrimination can be found in Westward's swift response to Dove's and Rogers' complaints. Accordingly, plaintiffs' claims of racial discrimination, whether founded on Title VII or § 1981, were properly dismissed on summary judgment.

## III

## CONCLUSION

For the reasons set forth above, we hold that plaintiffs have failed to submit evidence demonstrating genuine issues of material

14

fact as to their sexual harassment, retaliation, or race discrimination claims. Accordingly, the district court's grant of summary judgment dismissing plaintiffs' claims in their entirety is affirmed and their Rule 10(e) motion is denied as moot, given our consideration of their proffered additional evidence.

Summary Judgment AFFIRMED; Motion DENIED as moot.